RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ SEP 2 0 2022 ★

LONG ISLAND OFFICE

JJD:JD/MWS/SMY/WT
F. #2020R00632

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – X

UNITED STATES OF AMERICA

- against -

VLADIMIR ANTONIO AREVALO-CHAVEZ,
    also known as "Vampiro de Monserrat
    Criminales,"
JOSE WILFREDO AYALA-ALCANTARA,
    also known as "Indio de Hollywood,"
EDWIN ERNESTO CEDILLOS-RODRIGUEZ,
    also known as "Renuente de Abriles
    Dangers,"
JORGE ALEXANDER DE LA CRUZ,
    also known as "Cruger de Peatonales,"
WALTER YOVANI HERNANDEZ-RIVERA,
    also known as "Baxter de Park View,"
    and "Bastard de Park View,"
JUAN ANTONIO MARTINEZ-ABREGO,
    also known as "Mary Jane de Hollywood,"
MARLON ANTONIO MENJIVAR-PORTILLO,
    also known as "Rojo de Park View,"
CARLOS TIBERIO RAMIREZ-VALLADARES,
    also known as "Snayder de Pasadena,"
DANY FREDY RAMOS-MEJIA,
    also known as "Cisco de Teclas,"
FRANCISCO JAVIER ROMAN-BARDALES,
    also known as "Veterano de Tribus,"
DANY BALMORE ROMERO-GARCIA,
    also known as "Big Boy de Normandies,"
    "Dig Boy de Normandies," and
    "D Boy de Normandies,"
RUBEN ANTONIO ROSA-LOVO,
    also known as "Chivo de Centrales," and
MIGUEL ANGEL SERRANO-MEDINA,
    also known as "Cabro de Park View,"

                Defendants.

– – – – – – – – – – – – – – – – – – – X

I N D I C T M E N T

Cr. No. **CR 22 429**

(T. 8, U.S.C., §§ 1324(a)(1)(A)(v)(I),
1324(a)(1)(B)(i), 1324(a)(1)(B)(iii), and
1324(a)(1)(B)(iv); T. 18, U.S.C.,
§§ 981(a)(1)(C), 981(a)(1)(G), 1962(d),
1963, 1963(a), 1963(m), 2339A(a), and 3551
et seq.; T. 21, U.S.C., §§ 853(a), 853(p),
960a(a), and 970; T. 28, U.S.C., § 2461(c))

**BROWN, J.**

**SHIELDS, M.J.**

THE GRAND JURY CHARGES:

<u>INTRODUCTION</u>

At all times relevant to this Indictment, unless otherwise indicated:

<u>The Enterprise</u>

1.     La Mara Salvatrucha (hereinafter "MS-13" or the "Enterprise") was a transnational criminal organization with members located throughout the Eastern District of New York, El Salvador, Mexico, and elsewhere in the United States and the world.  MS-13 had tens of thousands of members worldwide.  Members and associates of MS-13 engaged in acts of violence, including acts involving murder, robbery, and assault, as well as other criminal activity, including narcotics trafficking, extortion, witness tampering, and witness retaliation.  MS-13 members and associates engaged in "terrorist activity," as defined by Title 8, United States Code, Sections 1182(a)(3)(B)(iii) and 1182(a)(3)(B)(iv), and in "terrorism," as defined by Title 22, United States Code, Section 2656f(d)(2).  MS-13 and its members used violence against law enforcement, military members, government officials, and civilians in El Salvador in order to obtain concessions from the government of El Salvador, to retaliate for government actions against MS-13's members and leaders, and to achieve political goals.  MS-13's leaders also directed members to commit acts of violence, including murder, in the United States.  In order to achieve its goals in El Salvador, the United States, and elsewhere, MS-13's leaders recruited large numbers of members; established an organizational leadership structure; issued rules to govern MS-13's members; established military-style training camps; obtained weapons such as rifles, handguns, grenades, improvised explosive devices ("IEDs"), and rocket launchers; negotiated with El Salvador government officials; engaged in public relations efforts; controlled neighborhoods; and directed acts of violence and murder in El Salvador, Mexico, the United States, and elsewhere.  Further, MS-13 used its large membership in the United States to engage

2

in criminal activities such as drug trafficking and extortion to raise money to support MS-13's

terrorist activities and terrorism in El Salvador and elsewhere, and directed members in the

United States to commit acts of violence, including murders, in furtherance of MS-13's goals and

to retaliate against the United States for actions, or perceived actions, taken against MS-13 and

its leaders.

2.      MS-13, including its leadership, membership, and associates, constituted

an "enterprise" as defined by Title 18, United States Code, Section 1961(4), that is, a group of

individuals associated in fact.  The Enterprise constituted an ongoing organization whose

members functioned as a continuing unit for a common purpose of achieving the objectives of

the Enterprise.  The Enterprise was engaged in, and its activities affected, interstate and foreign

commerce.

<u>History of MS-13</u>

3.      MS-13 was established in the 1980s in the United States by Central

American immigrants in southern California.  Many of these immigrants were refugees from

civil wars in Central America.  Immigrants from El Salvador, Honduras, and Guatemala joined

together into neighborhood groups calling themselves the "Mara Salvatrucha Stoners."  The

"Mara Salvatrucha Stoners" evolved into a street gang that engaged in drug trafficking,

extortion, and acts of violence, and dropped the reference to "Stoners" in their name.  As

members were arrested and incarcerated, they encountered members of the Mexican Mafia,

which controlled large portions of the Hispanic prison population in California.  In order to gain

protection while in prison, Mara Salvatrucha members pledged loyalty to the prison gang, the

Mexican Mafia, and added the number 13 to their name, which became "La Mara Salvatrucha

13," or "MS-13."

4.      MS-13 gang members in California organized themselves into local neighborhood groups known as "cliques." These cliques often were named after streets or neighborhoods in the Los Angeles area, such as Hollywood, Park View, Normandie, Francis, Fulton, or Coronado. MS-13 also developed symbols and signs to signify gang membership and territory through use of tattoos, hand signs, and graffiti. These symbols included the "devil's horns" and tattoos of the letters M and S and the number 13. MS-13 developed intense rivalries with other street gangs made up of Central American immigrants, particularly with "Barrio 18" or "18th Street" (hereinafter "18th Street").

5.      By the 1990s, the civil wars in El Salvador and elsewhere in Central America ended. Ultimately, thousands of MS-13 members who had committed crimes in the United States were deported to El Salvador and other Central American countries. These deported MS-13 members brought MS-13 to El Salvador, Honduras, and Guatemala where it began to grow dramatically. MS-13 also expanded in the United States as members from Central America immigrated throughout the United States. Eventually, MS-13 grew to include tens of thousands of members in El Salvador, Honduras, Guatemala, Mexico, the United States, and elsewhere. In the United States, MS-13 grew to include thousands of members located in dozens of states, including New York, New Jersey, Massachusetts, Virginia, Maryland, North Carolina, Ohio, Tennessee, Texas, California, Nevada, Florida, Georgia, Colorado, and District of Columbia.

Creation of the *Ranfla*

6.      As MS-13 grew in El Salvador, members of MS-13 began to commit crimes in El Salvador, including acts of violence, drug trafficking, and extortion. MS-13 members were incarcerated in prisons in El Salvador in large numbers and, in the early 2000s, began to organize and sought to control the prisons where they were incarcerated. This

organization included the creation of a formal hierarchy, set of rules, and leadership body to control and profit from the activities of the gang in El Salvador, the United States, and elsewhere.  In approximately 2002, MS-13 members in an El Salvadoran prison organized the first leadership body for MS-13, known as the "Twelve Apostles of the Devil."

7.    In approximately 2004, the "Twelve Apostles of the Devil" were transferred to a new prison and renamed themselves the "*Ranfla*."  Members of the original *Ranfla* became known as the "*Ranfla Historica*."  Subsequently, the original leaders of the *Ranfla Historica* and other high-ranking leaders formed the "*Ranfla Nacional*," which was the highest level of leadership in MS-13 and provided overall direction for the organization, acting as the equivalent of a "board of directors."

<u>Organization of MS-13</u>

8.    The *Ranfla Nacional* organized MS-13 into a more formal hierarchy to manage gang activities in El Salvador, the United States, Mexico, and elsewhere.  MS-13 was organized, at its lowest level, into groups known as "cliques" that held regular meetings to coordinate gang activities.  Each clique was run by a senior leader, who was designated the "*Primera Palabra*," "First Word," or "Clique *Corredor*," and, in some cases, a second-in-command, who was designated the "*Segunda Palabra*" or "Second Word."  The other members and associates of the clique took their orders from the First Word or Second Word.  The leaders of the respective cliques attended larger general meetings to manage gang operations on a regional and international level.  Some cliques had members in multiple countries, including in both the United States and El Salvador or other Central American countries.

9.    MS-13 members attended clique meetings and were required to pay dues. MS-13 members obtained money through illegal means, including, but not limited to, extortion and drug trafficking.  The money was provided to clique leaders and used to finance clique

activities, to provide support for clique members who were in jail, and, with respect to the United States-based cliques, to send funds to MS-13 in El Salvador to support gang activities there, including for the purchase of weapons.

10.    MS-13 cliques were organized together under umbrella groups, called "Programs." Cliques within a Program were responsible for assisting one another with firearms, drug trafficking connections, territorial disputes with rival gangs, and providing safe havens for members who were wanted by law enforcement. Programs were supervised and directed by Program leaders based in El Salvador, commonly referred to as "*Corredors*." These Programs included control of cliques located in the United States.

11.    Above the Program level, MS-13 in El Salvador was divided into four "Zones," East, West, Central, and Paracentral. Numerous Programs fell under each Zone. Individuals holding the title of "Zone *Corredor*" often supervised multiple Program *Corredors*. Zone *Corredors* supervised the Program activities occurring in large Zones of El Salvador and were tasked with supervising multiple Programs.

12.    Above the Zone *Corredors* were higher layers of leadership. Immediately above the Zone *Corredors* were the "*Ranfla en las Calles*" or the "*Ranfla* in the Streets," which consisted of leadership that was not in prison. Some Zone *Corredors* were also considered to be *Ranfla en las Calles*. The most powerful leaders in the *Ranfla en las Calles* formed a group to coordinate their activities that was called the "*Federacion*." The *Ranfla en las Calles* reported to the "*Ranfla en los Penales*" or the "*Ranfla* in the Prisons," which consisted of senior MS-13 leaders who were incarcerated in El Salvador. The *Ranfla en las Calles* and the *Ranfla en los Penales* reported to the highest level of leadership, which was the *Ranfla Nacional*. All major decisions for MS-13 had to be approved by the *Ranfla Nacional*.

13.     The roles of certain MS-13 leaders, including some of the defendants, changed over time, based on whether the leaders were in or out of prison, the internal politics of MS-13, and changing strategies. For example, a leader might be a member of the *Ranfla en las Calles* when out of prison, but become a member of the *Ranfla en los Penales* when arrested and incarcerated. The defendants JOSE WILFREDO AYALA-ALCANTARA, also known as "Indio de Hollywood," CARLOS TIBERIO RAMIREZ-VALLADARES, also known as "Snayder de Pasadena," DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas," and RUBEN ANTONIO ROSA-LOVO, also known as "Chivo de Centrales," were considered part of the *Ranfla Nacional*. The defendants VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as "Vampiro de Monserrat Criminales," EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as "Renuente de Abriles Dangers," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park View" and "Bastard de Park View," JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood," MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View," FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D Boy de Normandies," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View," were considered members of the *Ranfla en los Penales* when incarcerated and of the *Ranfla en las Calles* when out of prison.

14.     By approximately 2015 and continuing to the present, MS-13 consisted of tens of thousands of members organized into more than 200 cliques and dozens of Programs in El Salvador, Honduras, Guatemala, Mexico, the United States, and elsewhere. Since 2015, there have been additional reorganizations, which have changed the numbers of cliques and Programs.

### MS-13 Rules

15.     In order to maintain control over the membership of MS-13, the *Ranfla Nacional* developed rules to govern the behavior of members. The *Ranfla Nacional* used the *Ranfla en los Penales* to distribute these rules to members in prisons in El Salvador and the *Ranfla en las Calles* to distribute the rules to members in El Salvador, the United States, and elsewhere. Only the *Ranfla Nacional* could change the rules or add new rules. As circumstances changed, the *Ranfla Nacional* made changes to the rules. For example, after law enforcement in the United States began to use MS-13 tattoos as evidence against MS-13 members at trial, the *Ranfla Nacional* changed the rules to restrict members from getting MS-13 tattoos without the permission of MS-13 leaders. The *Ranfla en los Penales* and the *Ranfla en las Calles* aided in the distribution and enforcement of any new or modified rules.

16.     A central theme of the rules was the requirement of loyalty to MS-13, or to the "*barrio*." The requirement of loyalty was central to all aspects of life for MS-13 members. Members who disobeyed the rules, showed disloyalty to MS-13 or to its leaders, cooperated with law enforcement, or disrespected other members were subject to severe punishment, including death. Another theme of the rules was the requirement to follow the hierarchy of the Enterprise and its leadership structure, which included the *Ranfla en los Penales* and the *Ranfla en las Calles*.

### Means of Financing MS-13 Operations

17.     MS-13 members in El Salvador, Mexico, the United States, including in the Eastern District of New York, and elsewhere engaged in criminal activity to finance MS-13 operations. Commonly, MS-13 engaged in extortion of businesses, both legitimate and illegitimate, and individuals. This extortion was known as paying "rent" to MS-13 and was a means of exercising control over neighborhoods.

18.     MS-13 also engaged in drug trafficking to earn money to support its operations.  MS-13 members and cliques trafficked in marijuana, cocaine, heroin, and methamphetamine in El Salvador, Mexico, the United States, including in the Eastern District of New York, and elsewhere.  Proceeds from drug trafficking were collected by MS-13 leaders to support gang activities, including purchasing weapons, in El Salvador and the United States. Drug trafficking proceeds were also sent by wire transfer from members and cliques in the United States to MS-13 in El Salvador, often using non-gang members to send or receive the money to conceal the transfer from law enforcement.

19.     MS-13 exploited certain migration paths in Mexico leading from Guatemala to the United States.  MS-13 in Mexico charged "protection fees" to immigrants destined for the United States, including the Eastern District of New York, as well as charged fees to the leaders, known as "coyotes," who wished to travel through MS-13 controlled migration routes.  Money collected was sent to MS-13 in El Salvador and used to finance the purchase of weapons, drugs, and other logistical expenses of the Enterprise.

Control of MS-13 from Prison

20.     As MS-13 grew in power in El Salvador, members of the *Ranfla Nacional* and *Ranfla en los Penales* were incarcerated, but continued to manage the activities of MS-13 in El Salvador, Mexico, the United States, and elsewhere through the use of contraband cell phones, the distribution of written messages known as "*wilas*" that were smuggled out of prison, intermediaries, and the organizational structure of subordinate leaders.  Using these methods, the *Ranfla Nacional* and *Ranfla en los Penales* were able to continue to communicate with, issue orders to, and receive reports from the *Ranfla en las Calles*.  The *Ranfla Nacional* established the organizational structure described above, including the creation of the *Ranfla en los Penales* and the *Ranfla en las Calles*, in part, to ensure their ability to maintain control of MS-13 when they

9

were incarcerated and subject to increased security measures. For example, when members of

the *Ranfla Nacional* were subject to increased security measures that restricted their ability to

communicate, the *Ranfla en los Penales* were empowered to make decisions on their behalf

inside the prisons and the *Ranfla en las Calles* were similarly empowered to make decisions on

the streets.

The Role of the *Ranfla Nacional, Ranfla en los Penales,* and *Ranfla en las Calles* in<br/>the United States and the Eastern District of New York

21.     The *Ranfla Nacional*, *Ranfla en los Penales*, and *Ranfla en las Calles*

exercised control over the activities of MS-13 in areas of the United States, including in the

Eastern District of New York. The actions of MS-13 cliques and members in the Eastern District

of New York and elsewhere were regulated by the rules and organizational structure put in place

by the *Ranfla Nacional,* which were distributed to members through the *Ranfla en los Penales*

and *Ranfla en las Calles*. These rules controlled the process for recruitment of new members

and advancement to higher ranks for members in the Eastern District of New York and

elsewhere. The *Ranfla Nacional* often required MS-13 members to obtain the approval of the

*Ranfla Nacional*, through the *Ranfla en las Calles,* prior to immigrating to the United States.

Certain murders in the United States by members of MS-13, including the murder of MS-13

members suspected of cooperating with law enforcement or otherwise violating the rules of MS-

13, required the approval of the *Ranfla Nacional*. Approvals were requested and obtained

through the hierarchy of clique leaders, Program *Corredors*, Zone *Corredors*, *Ranfla en las*

*Calles*, and *Ranfla en los Penales*. Cliques in the Eastern District of New York and elsewhere

were also required to send money from the dues and proceeds of drug trafficking, extortion, and

other criminal activity to MS-13 in El Salvador. These funds were also submitted through the

leadership hierarchy established by the *Ranfla Nacional*. The *Ranfla en las Calles* managed the

10

collection of these funds in El Salvador. In order to exert greater control over the operation of cliques in the Eastern District of New York and elsewhere, the *Ranfla Nacional* sent trusted, subordinate leaders, including members of the *Ranfla en las Calles*, to Mexico and the United States to manage the flow of members to the United States, to direct the activities of cliques, and to enforce MS-13 rules, which resulted in an increase of violence and other criminal activity by MS-13 in the United States.

22.     MS-13 established multiple cliques in the Eastern District of New York. Members of these cliques operated under the rules issued by the *Ranfla Nacional* in El Salvador and reported through the leadership hierarchy to the *Ranfla en las Calles*, the *Ranfla en los Penales,* and, ultimately, the *Ranfla Nacional*. The *Ranfla Nacional*, with input from the *Ranfla en los Penales* and the *Ranfla en las Calles,* resolved disputes between cliques in the Eastern District of New York. In accordance with the rules and orders issued by the *Ranfla Nacional,* the *Ranfla en los Penales,* and the *Ranfla en las Calles,* members of these cliques committed multiple acts of violence in the Eastern District of New York, including murders, attempted murders, assaults, and kidnappings; trafficked drugs in the Eastern District of New York and sent proceeds back to MS-13 in El Salvador; engaged in extortion of individuals and businesses in the Eastern District of New York; and sent dues and the proceeds of criminal activity by wire transfer from the Eastern District of New York to MS-13 in El Salvador.

Expansion to Mexico

23.     The *Ranfla Nacional* directed the expansion of MS-13 activities into Mexico and sent several high-ranking leaders who were members of the *Ranfla en las Calles* to Mexico to organize operations there, including the defendants VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as "Vampiro de Monserrat Criminales," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," WALTER YOVANI

HERNANDEZ-RIVERA, also known as "Baxter de Park View" and "Bastard de Park View,"

JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood,"

MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View,"

FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," and

MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View" (collectively,

the "Mexico Program Leaders"). The Mexico Program Leaders made connections to obtain

narcotics and firearms, conducted business with Mexican drug cartels such as the Zetas, Gulf

Cartel, Jalisco New Generation Cartel ("CJNG"), and Sinaloa Cartel, and engaged in human

trafficking and smuggling.

24.     The MS-13 presence in Mexico existed as early as 2007. In

approximately 2015, the *Ranfla Nacional* began sending the Mexico Program Leaders to Mexico

in order to better structure and organize MS-13's presence in Mexico, facilitate communications

with MS-13 leaders and members in the United States, and to increase the power and status of

MS-13. They selected these leaders to carry on MS-13 operations in the event the El Salvadoran

government attempted to shut down the organization's leadership structure in El Salvador.

25.     The Mexico Program Leaders sought to exploit migrant routes in Mexico

to provide strategic and monetary advantages to MS-13. MS-13 extorted migrant groups bound

for the United States and charged protection fees for safe passage. The Mexico Program Leaders

exploited certain routes with the permission of Mexican cartels. Exploitation of these routes

allowed the Mexico Program Leaders to maintain control of cliques and MS-13 members in the

United States, Mexico, El Salvador, and elsewhere at the behest of the *Ranfla Nacional*.

Members of MS-13 were trafficked through these routes to various places in the United States,

including to the Eastern District of New York.

26.    In or about and between 2015 and 2018, the Mexico Program Leaders, at the request of the *Ranfla Nacional*, exploited smuggling routes via train, commonly used by Central American migrants. These train routes became known as "La Bestia" or "The Beast." The Mexico Program Leaders, at the behest of the *Ranfla Nacional*, controlled MS-13 members who patrolled these train routes, charged extortion fees, and threw migrants off the trains who refused to pay. This frequently led to serious injury or death to those migrants. The Mexico Program Leaders also sought out and murdered rival gang members, or MS-13 members seeking to leave the gang, who were found on these trains.

27.    Money obtained from operations in Mexico, including the alien smuggling trafficking routes, was funneled back to MS-13 leaders in El Salvador by the Mexico Program Leaders. This money, along with arms and large marijuana shipments, was used to fund MS-13's operations, including sponsoring activities meant to influence the government of El Salvador.

### "Green Lights" and "Opening the Valves"

28.    The *Ranfla Nacional* had the power to approve a "green light" on anyone it chose. A "green light" was an order to murder the subject of the "green light." The *Ranfla Nacional* approved "green lights" on rival gang members, law enforcement officers, military members, government officials, witnesses, MS-13 members who cooperated with law enforcement, MS-13 members who appeared to be challenging the leadership of the *Ranfla Nacional*, MS-13 members who disobeyed the rules, and anyone it felt had disrespected them or MS-13. The *Ranfla Nacional* ordered "green lights" on individuals and groups. For example, in approximately 2004, the *Ranfla Nacional* ordered a "green light" on all members of the Coronados clique due to a dispute between the Coronados and other cliques. The "green light" applied to specific leaders and to all members of the clique who did not join other cliques. The

13

*Ranfla Nacional* used the *Ranfla en los Penales* and the *Ranfla en las Calles* to issue and enforce "green lights" they approved. The *Ranfla en las Calles* were often responsible for ensuring that "green lights" were carried out. The *Ranfla en los Penales* and the *Ranfla en las Calles* also had authority to approve "green lights" on behalf of the *Ranfla Nacional* when the *Ranfla Nacional's* communications were restricted due to security measures in prison.

29.     In addition to ordering "green lights" to kill specific persons, at times, the *Ranfla Nacional* would authorize MS-13 members to generally commit murders of rivals, law enforcement cooperators, police officers, witnesses, violators of MS-13 rules, and anyone else believed to be worthy of death. The *Ranfla Nacional* called this "opening the valves." Only the *Ranfla Nacional* could order the "opening of the valves," to generally authorize members to commit murders. Orders to "open the valves" were also transmitted and applied to members in the United States. When the *Ranfla Nacional* determined that it was no longer in their interest to authorize murder generally, they ordered that "the valves were closed." The purposes of "opening the valves" were to cause fear and intimidation, to influence government conduct, and to retaliate against government action. The *Ranfla en las Calles* helped distribute the order to "open the valves" to members on the streets.

<u>Political Influence in El Salvador</u>

30.     The *Ranfla Nacional* gained political influence as a result of the violence and intimidation MS-13 exerted on the government and population of El Salvador. Through extortion and violence, MS-13 controlled parts of El Salvador's economy and large areas of territory. Through control of the level of violence, the *Ranfla Nacional* exercised leverage with the government of El Salvador, which it used to enter secret negotiations with the representatives of the government of El Salvador and political parties.

31.     Starting in approximately 2012, the *Ranfla Nacional* engaged in secret negotiations with members of the then-ruling *Farabundo Marti National Liberation Front* ("FMLN") party of El Salvador, and MS-13's principal rival, the 18th Street gang, to enter into a "truce" to reduce homicides in El Salvador in exchange for transfers to less secure prisons, improved prison conditions, conjugal visits, cash payments, and other benefits and privileges. The *Ranfla Nacional* also negotiated with the FMLN and its rival political party, the *Alianza Republicana Nacionalista* ("ARENA"), to provide votes to political candidates in exchange for benefits for MS-13 and the *Ranfla Nacional* themselves.  Members of the *Ranfla Nacional, Ranfla en los Penales,* and the *Ranfla en las Calles*, including the defendants VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as "Vampiro de Monserrat Criminales," JOSE WILFREDO AYALA-ALCANTARA, also known as "Indio de Hollywood," EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as "Renuente de Abriles Dangers," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," CARLOS TIBERIO RAMIREZ-VALLADARES, also known as "Snayder de Pasadena," DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas," DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D Boy de Normandies," and RUBEN ANTONIO ROSA-LOVO, also known as "Chivo de Centrales," participated in the negotiations, including meeting with government officials, politicians, and non-governmental organizations inside and outside prison.  From approximately 2012 until approximately 2015, the *Ranfla Nacional* directed that MS-13 should reduce homicides in El Salvador in exchange for the aforementioned benefits conferred on MS-13 by the government of El Salvador.  However, in approximately 2015, the "truce" collapsed and was terminated.  The *Ranfla Nacional* blamed the end of the "truce" on the United States, believing that the United States government pressured

15

the government of El Salvador to end the "truce" as a condition of receiving funds from the United States.

32.    After the end of the "truce," the government of El Salvador moved several of the *Ranfla Nacional* back to secure prisons with more restrictive conditions.  In retaliation, and in an effort to force the government of El Salvador to enter into new negotiations, the *Ranfla Nacional,* through the *Ranfla en los Penales* and the *Ranfla en las Calles,* ordered MS-13 members in El Salvador to increase violence, resulting in a significant increase in murders and other violent acts, including the targeting of police officers and government officials.  Because they believed that the United States government was to blame for the collapse of the "truce," the *Ranfla Nacional,* through the *Ranfla en los Penales* and the *Ranfla en las Calles,* also directed leaders in the United States to increase violence in the United States, including within the Eastern District of New York.  The *Ranfla Nacional* directed the defendant JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood," to go to the United States to better organize operations as part of this effort.

33.    In early 2016, the *Ranfla Nacional,* in coordination with the *Ranfla en los Penales* and the *Ranfla en las Calles,* began planning for a major campaign of coordinated violence in El Salvador in retaliation for the harsher measures imposed on its members after the end of the "truce."  The *Ranfla Nacional* ordered all cliques in El Salvador to provide two members to create a specialized unit of MS-13 members to be used to attack the police.  The *Ranfla Nacional* directed these members to undergo military training at MS-13 military training camps in El Salvador.  The *Ranfla Nacional* ordered all cliques, including those in the United States and in the Eastern District of New York, to provide their profits from select months for a special collection to be used to purchase weapons for the planned attacks on police in El Salvador, including machine guns, grenades, IEDs, and rocket launchers.  Members of the *Ranfla*

*en las Calles,* including the defendants JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as "Renuente de Abriles Dangers," WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park View" and "Bastard de Park View," JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood," MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View," FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D Boy de Normandies," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View," participated in and managed the collection of these funds and the purchase of weapons, collecting over $600,000 and purchasing numerous weapons. The *Ranfla en las Calles* worked with cliques in El Salvador to identify the names and addresses of police officers, military members, and government officials in their areas as potential targets for the planned attacks.

34.     The Mexico Program also operated a contingency plan to ensure continuity of operations for the Enterprise in the event the government of El Salvador successfully curtailed MS-13's command and control structure in El Salvador. Additionally, the Mexico Program was able to broker the purchase and transportation of weapons from Mexico into El Salvador for offensive operations.

35.     After the end of the "truce," the *Ranfla Nacional* continued to negotiate with the government and political parties in El Salvador as part of its efforts to maintain the power and influence of MS-13 and obtain benefits from the government of El Salvador, including without limitation negotiations in connection with the February 2019 El Salvador presidential election. The defendants JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," and CARLOS TIBERIO RAMIREZ-VALLADARES, also known as

"Snayder de Pasadena," were heavily involved in these negotiations. Following the February 2019 El Salvador presidential election, MS-13 leaders, including *Ranfla Nacional* leaders Borromeo Enrique Henriquez, also known as "Diablito de Hollywood," Elmer Canales-Rivera, also known as "Crook de Hollywood," and RAMIREZ-VALLADERES, secretly met numerous times with representatives of the government of El Salvador inside Zacatecoluca and Izalco prisons and elsewhere. These meetings were arranged by El Salvadoran government and prison officials, including, but not limited to, the Director of *Centro Penales* (National Prisons) and the Director of *Tejido Social Reconstruccion* (Social Fabric Reconstruction). The government representatives secretly attending these meetings at the prisons often wore masks and refused to identify themselves when entering the prisons in violation of prison rules. MS-13 leaders from outside prison also attended these meetings inside the prisons. These MS-13 leaders also wore masks and long-sleeved shirts to hide their tattoos and identities, were provided with official identification cards identifying them as intelligence or law enforcement officials, and were escorted by El Salvadoran prison officials. DE LA CRUZ coordinated the efforts of the MS-13 leaders and members outside of prison involved in these negotiations. DE LA CRUZ provided instructions and guidance on behalf of the *Ranfla Nacional* to the MS-13 leaders from outside prison who participated in the negotiations. Prison officials also facilitated the temporary transfers of MS-13 leaders, including Henriquez, to civilian hospitals for "treatment" for non-existent medical conditions, which enabled those leaders to communicate with members of the *Ranfla en las Calles* and facilitated the negotiations.

36.     As part of these secret negotiations, the *Ranfla Nacional*, *Ranfla en las Calles,* and *Ranfla en los Penales* negotiated with the high-level government officials for financial benefits, control of territory, less restrictive prison conditions that would enable the *Ranfla Nacional,* the *Ranfla en los Penales*, and other MS-13 leaders greater communication to

18

201 of 42 PageID #:

maintain control over MS-13, and legislative and judicial changes, including without limitation reduced prison sentences that would result in the early release of MS-13 leaders from prison. Further, the *Ranfla Nacional* demanded that the government of El Salvador refuse to extradite MS-13 leaders, including the *Ranfla Nacional*, to the United States for prosecution. In exchange, the MS-13 leaders agreed to reduce the number of public murders in El Salvador, which politically benefited the government of El Salvador, by creating the perception that the government was reducing the murder rate. When in fact, MS-13 leaders continued to authorize murders where the victims' bodies were buried or otherwise hidden. The MS-13 leaders also agreed to use MS-13's political influence to direct MS-13 members, friends and relatives of members, and residents of neighborhoods under MS-13 control, to support *Nuevas Ideas* candidates in the 2021 elections for El Salvador's Legislative Assembly.

37.     On January 14, 2021, the United States Department of Justice unsealed an indictment in the Eastern District of New York, which charged 14 members of the *Ranfla Nacional*, including Henriquez and Canales-Rivera, with terrorism offenses, and announced that it would explore options to extradite the *Ranfla Nacional* to the United States. The then-Attorney General for El Salvador announced his support for the extraditions of the *Ranfla Nacional* to the United States for prosecution. In 2021 and 2022, the Department of Justice submitted formal extradition requests for twelve of the *Ranfla Nacional* defendants. The *Ranfla Nacional* and other MS-13 leaders demanded that the government of El Salvador refuse to extradite the *Ranfla Nacional* defendants and other MS-13 leaders charged with crimes to the United States.

38.     Following the February 2021 elections in El Salvador, the *Nuevas Ideas* party and its political allies won a super-majority in El Salvador's Legislative Assembly. On May 1, 2021, the *Nuevas Ideas*-controlled Legislative Assembly took office and, that same day,

it removed the El Salvador Attorney General and five members of the El Salvador Supreme Court.

39.     On or about February 4, 2021, the International Criminal Police Organization ("INTERPOL") published a Red Notice for Canales-Rivera and he was arrested on that Red Notice in El Salvador, on or about June 5, 2021.  On or about July 22, 2021, the United States formally requested the extradition of Canales-Rivera.  Thereafter, the government of El Salvador released Canales-Rivera from custody, despite the INTERPOL Red Notice and pending extradition request from the United States.

### Special Designations

40.     On July 24, 2011, President Barack Obama issued Executive Order 13581, which declared a national emergency with respect to the activities of significant transnational criminal organizations.  Executive Order 13581 was based on a presidential finding that "significant transnational criminal organizations constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States."  Executive Order 13581 applied to specific significant transnational criminal organizations named in the annex to the order and to any person or entity designated by the Secretary of the Treasury as a significant transnational criminal organization.  Among other things, Executive Order 13581 prohibited transactions by United States persons or involving United States property with designated significant transnational criminal organizations.

41.     On October 11, 2012, the Secretary of the Treasury designated MS-13 as a significant transnational criminal organization, pursuant to Executive Order 13581.

42.     On August 24, 2015, the Supreme Court of El Salvador designated MS-13 as a terrorist organization under El Salvador's Special Laws Against Terrorism.

43.    On February 16, 2016, the Secretary of the Treasury designated the defendant DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D-Boy de Normandies," as a leader of MS-13, subject to sanctions imposed by Executive Order 13581.

The Defendants

44.    The defendant VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as "Vampiro de Monserrat Criminales," was a member of MS-13 and the leader of the San Salvador Program.  AREVALO-CHAVEZ participated in negotiations with the government of El Salvador on behalf of MS-13.  AREVALO-CHAVEZ fled to Mexico to escape law enforcement in El Salvador, where he became a leader of the Mexico Program.

45.    The defendant JOSE WILFREDO AYALA-ALCANTARA, also known as "Indio de Hollywood," joined MS-13 when he was living in the United States.  After being deported to El Salvador, AYALA-ALCANTARA rose to become a leader of the *Ranfla en las Calles*.  After being incarcerated, AYALA-ALCANTARA was elevated to be a member of the *Ranfla Nacional*.  AYALA-ALCANTARA also managed MS-13 operations in the United States, including drug trafficking.

46.    The defendant EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as "Renuente de Abriles Dangers," was a member of MS-13 and a leading member of the *Ranfla en las Calles*.  In 2016, CEDILLOS-RODRIGUEZ was one of the primary leaders responsible for procuring military-style weapons for MS-13 to retaliate against the El Salvadoran government.  CEDILLOS-RODRIGUEZ also participated in truce negotiations with El Salvadoran government officials.

47.    The defendant JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," was a member of MS-13, a member of the Mexico Program, and a

21

senior member of the *Ranfla en las Calles*. The *Ranfla Nacional* sent DE LA CRUZ to Mexico to assist with MS-13 operations there and he became the leader of MS-13 operations in Mexico. DE LA CRUZ was heavily involved on behalf of the *Ranfla Nacional* in negotiations with the government of El Salvador from 2019 to the date of this Indictment, including providing instructions to MS-13 members involved directly in the negotiations.

48.    The defendant WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park View" and "Bastard de Park View," was a member of MS-13, a member of the Mexico Program, and a member of the *Ranfla en las Calles*. HERNANDEZ-RIVERA raised funds and purchased weapons to retaliate against the El Salvadoran government. HERNANDEZ-RIVERA was also sent to Mexico to assist the leaders overseeing MS-13 operations in Mexico.

49.    The defendant JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood," was a member of MS-13, a member of the Mexico Program, and a member of the *Ranfla en las Calles*. MARTINEZ-ABREGO was part of the efforts to obtain firearms to retaliate against the government of El Salvador. The *Ranfla Nacional* sent MARTINEZ-ABREGO to Mexico and then to the United States to organize MS-13 operations there.

50.    The defendant MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View," was a member of MS-13, a member of the *Ranfla en las Calles*, and a member of the Mexico Program. MENJIVAR-PORTILLO was one of the primary MS-13 leaders in Mexico and a leader of the Park View clique. As a leader of the Park View clique, MENJIVAR-PORTILLO raised funds and purchased weapons to retaliate against the El Salvadoran government. The *Ranfla Nacional* sent MENJIVAR-PORTILLO to Mexico to expand and organize MS-13 operations.

22

51.    The defendant CARLOS TIBERIO RAMIREZ-VALLADARES, also known as "Snayder de Pasadena," was a member of MS-13 and an important MS-13 leader, and acted as a spokesman for MS-13 during negotiations with the El Salvadoran government. RAMIREZ-VALLADARES was also a member of the *Ranfla Nacional*. RAMIREZ-VALLADARES was a key participant in negotiations between MS-13 and the El Salvadoran government.

52.    The defendant DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas," was a member of MS-13, a long-time high-ranking member of MS-13, and a member of the *Ranfla Nacional*. RAMOS-MEJIA provided direction to MS-13 members in the United States, including encouraging violence. RAMOS-MEJIA also took part in negotiations with government officials.

53.    The defendant FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," was a member of MS-13, a member of the Mexico Program, and a founding member of the *Ranfla en las Calles*. ROMAN-BARDALES oversaw the "Western Zone" of MS-13 in El Salvador. The *Ranfla Nacional* sent ROMAN-BARDALES to Mexico to assist with leadership of the MS-13 Mexico Program. ROMAN-BARDALES established connections between MS-13 and Mexican drug cartels.

54.    The defendant DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D-Boy de Normandies," was a member of MS-13 and a member of the *Ranfla en las Calles*. ROMERO-GARCIA was a significant leader of MS-13 in prison and was a key participant, along with other MS-13 leaders, in negotiations with the El Salvadoran government. ROMERO-GARCIA also assisted in the purchase of weapons to retaliate against the El Salvadoran government.

23

55.    The defendant RUBEN ANTONIO ROSA-LOVO, also known as "Chivo de Centrales," was a member of MS-13, a member of the Centrales clique, and a member of the *Ranfla en las Calles*. He also managed MS-13 operations in the United States. ROSA-LOVO was involved in approvals for murders in the United States, including Virginia. ROSA-LOVO was considered part of the *Ranfla Nacional*.

56.    The defendant MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View," was a member of MS-13, a member of the Mexico Program, and a member of the *Ranfla en las Calles*. SERRANO-MEDINA was a leader of the Park View clique and was part of the approval chain for "green lights." SERRANO-MEDINA also purchased weapons for retaliation against the El Salvadoran government. The *Ranfla Nacional* sent SERRANO-MEDINA to Mexico to oversee MS-13 operations in that country.

### Purposes of the Enterprise

57.    The purposes of the Enterprise, included but were not limited to the following:

(a)    preserving, expanding, and protecting the power, territory, and reputation of MS-13 in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere through the use of violence, threats of violence, and intimidation;

(b)    influencing the actions of governments in El Salvador and elsewhere to implement policies favorable to MS-13;

(c)    supporting specific political parties in El Salvadoran elections with the purpose of obtaining benefits in return when the party took office;

(d)    retaliating against the government of El Salvador and against the United States for actions believed to be unfavorable to MS-13;

(e)    establishing control of territory and civilian populations in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere that MS-13 could use and exploit to benefit the Enterprise;

(f)    promoting and enhancing MS-13 and the activities of its members and associates in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere by committing crimes, including, but not limited to, acts involving murder, assault, other crimes of violence, extortion, and drug trafficking;

(g)    keeping victims, potential victims, community members, and law enforcement in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere in fear of MS-13 and its members and associates through violence, threats of violence, and intimidation;

(h)    confronting and retaliating against rival gangs in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere through the use of violence, threats of violence, and intimidation;

(i)    murdering, attempting to murder, and assaulting individuals believed to be cooperating with law enforcement authorities in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere;

(j)    hindering and obstructing efforts of law enforcement to identify, apprehend, extradite, and successfully prosecute offending MS-13 members in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere;

(k)    providing financial support to MS-13 members, including incarcerated MS-13 members in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere; and

(l)      enriching the Enterprise through receipt of the proceeds of MS-13's criminal activities, including extortion and drug trafficking, from members and cliques in El Salvador, the United States, including the Eastern District of New York, and elsewhere.

<u>Manner and Means Used by the Enterprise</u>

58.     In order to carry out the aforementioned goals, the Enterprise, within El Salvador, Mexico, the United States, including in the Eastern District of New York, and elsewhere, used a variety of manner and means, including the following:

(a)      The Enterprise issued rules and directives that MS-13 members in El Salvador, the United States, including the Eastern District of New York, and elsewhere were required to follow. The rules included procedures for investigating violations and punishments for violators that included beatings and death.

(b)      The Enterprise directed violence against the government of El Salvador, including police officers, military members, and other government officials, and their families, in retaliation for taking actions against MS-13.

(c)      The Enterprise directed an increase in violence in the United States, including murders, in retaliation for what it believed was the role of the United States government in the termination of a "truce" with the El Salvadoran government.

(d)      The Enterprise ordered the murder of a Federal Bureau of Investigation Special Agent assigned to official duties in El Salvador on account of the Special Agent's performance of those duties.

(e)      The Enterprise required members of MS-13 to obtain authorization to commit murders in El Salvador, the United States, including the Eastern District of New York, and elsewhere.

(f)      The Enterprise periodically provided general authorization to MS-13 members in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere to commit murders of rival gang members, law enforcement, individuals cooperating with law enforcement, or others in dispute with MS-13. This general authorization to commit murders was called "opening the valves." The Enterprise also could suspend this general authorization by giving orders to "close the valves."

(g)      The Enterprise authorized MS-13 members to commit specific murders in El Salvador, Mexico, the United States, including the Eastern District of New York, and elsewhere. This authorization was called issuing a "green light."

(h)      The leaders of the Enterprise settled disputes between MS-13 cliques in El Salvador, the United States, including the Eastern District of New York, and elsewhere.

(i)      The leaders of the Enterprise negotiated with the government of El Salvador to obtain benefits and concessions to benefit the Enterprise and members of the Enterprise.

(j)      The Enterprise used traditional and online media to improve its image, make demands of the government of El Salvador, issue threats, and publicize acts of violence to intimidate the police and civilian population of areas under its control.

(k)      The Enterprise directed the collection of money from every clique, including cliques in the United States, including the Eastern District of New York, to be used to fund the purchase of weapons such as machine guns, handguns, grenades, IEDs, and body armor to be used to attack police, military, and government officials in El Salvador, in retaliation for taking actions against MS-13.

(l)      The Enterprise established a Mexico Program to control immigration routes and extortion schemes within Mexico, increase drug trafficking operations to El Salvador and the United States, obtain weapons for use in El Salvador, and have a second command and control structure within Mexico as a contingency plan in the event leadership in El Salvador was rendered ineffective due to the efforts of the government of El Salvador.

(m)      The Enterprise established training camps in El Salvador for MS-13 members to be trained in military tactics and the use of military-grade weapons.

(n)      The Enterprise used cellular phones, including contraband cellular phones illegally smuggled into jails and prisons, and encrypted application-based communication systems to discuss gang-related business and to direct the activities of MS-13 in El Salvador, the United States, including the Eastern District of New York, and elsewhere.

(o)      The Enterprise issued written orders and messages, called "*wilas*," that were smuggled out of prison and distributed to MS-13 members.

(p)      The Enterprise created a system to manage MS-13 from prison when the conditions of the prison made it impossible for the leaders of the Enterprise to communicate with members outside of prison, including using co-conspirators to create lines of communication to communicate with members outside of prison on specific topics.

(q)      The Enterprise required MS-13 members and cliques in the United States, including the Eastern District of New York, to pay dues, often the proceeds of drug trafficking and extortions, to send to MS-13 leadership in El Salvador to provide financial support for the Enterprise, including for the purchasing of weapons to use to commit acts of violence in El Salvador.

(r)     The Enterprise engaged in, managed, organized, and directed MS-13 members to engage in extortion of businesses, individuals, and public transportation entities in El Salvador, the United States, including the Eastern District of New York, and elsewhere.

(s)     The leaders of the Enterprise engaged in, managed, and directed MS-13 members to engage in drug trafficking to earn money to support the activities of the Enterprise and enrich members of the Enterprise.

(t)     The Enterprise sought to obtain and stockpile weapons, and directed MS-13 members to obtain and stockpile weapons.

(u)     The Enterprise directed MS-13 members to obtain and use explosives, grenades, IEDs, and rockets.

(v)     The Enterprise directed MS-13 members and associates to use non-gang members to send and receive funds such as dues payments from members and cliques in the United States, including the Eastern District of New York, to MS-13 in El Salvador in order to conceal the source and recipients of the funds.

(w)     The Enterprise created an organizational structure of *ranflas*, zones, programs, and cliques to manage the activities of MS-13 in El Salvador, the United States, including the Eastern District of New York, and elsewhere.  When necessary, the *Ranfla Nacional* made changes to the leadership and organizational structure.

(x)     The Enterprise issued rules and created a rank structure for controlling the recruitment of new members and their advancement within MS-13.

(y)     The Enterprise appointed and promoted members to serve as lower-level leaders within MS-13.

(z)     The Enterprise dispatched members and subordinate leaders to the United States to organize, manage, and increase MS-13 operations in the United States, often resulting in an increase in violence in the United States.

(aa)     The Enterprise dispatched leaders and members to Mexico to develop and manage MS-13 operations in Mexico related to drug trafficking, weapons trafficking, human trafficking, and smuggling.

(bb)     The Enterprise issued orders to kill individuals believed to be cooperating with law enforcement.

(cc)     The Enterprise directed members of MS-13 to use violence to intimidate the local civilian population, to influence the civilian population to vote for political parties associated with MS-13, to influence the actions of the government of El Salvador, to retaliate against government actions, to attempt to force the government to negotiate, and to kill law enforcement officers in El Salvador.

(dd)     The Enterprise sought to exploit certain migrant trafficking routes in Mexico and exploited migrant groups bound for the United States.

(ee)     As part of their exploitation of trafficking routes, the Enterprise required MS-13 members to charge "protection fees" per person in the migrant group for safe passage. Failure to pay the extortion fees resulted in physical abuse up to, and including, murder.

(ff)     The Enterprise exploited the trafficking routes through Mexico to ensure safe and secure passage for MS-13 members bound for the United States, as members replenished cliques depleted by prosecutions and deportations, including within the Eastern District of New York. Additionally, by facilitating the passage of MS-13 members from El Salvador through Mexico, the Enterprise maintained control of cliques and members in the

United States.  Mexico Program Leaders communicated with leaders in El Salvador, including members of the *Ranfla Nacional,* the *Ranfla en los Penales*, and the *Ranfla en las Calles*, to determine: (1) if the MS-13 member was in good or bad standing, and (2) if the MS-13 member was in bad standing, what actions they should take.  Punitive actions included murder by the Mexico Program MS-13 members.

       (gg)    The Enterprise also exploited the Mexico trafficking routes to seek out members of rival gangs who they had killed if they were discovered by MS-13 members.  The Mexico Program leaders had MS-13 members bury the bodies of rival gang member victims in unmarked graves or dissolved their bodies in chemicals.

       (hh)    From approximately 2012 and continuing until 2018, the Enterprise exploited certain train routes commonly used by Central American migrants, also known as "La Bestia" or "The Beast."  The Enterprise directed MS-13 members to patrol these trains, charge extortion fees, and throw migrants off the train who refused to pay, leading to serious injury or death for those victims.

       (ii)    The Enterprise funneled money obtained from MS-13 operations in Mexico back to El Salvador for the use of MS-13.  The Enterprise also funneled arms and large marijuana shipments back to El Salvador for the use of MS-13.  The *Ranfla Nacional* directed that this money be used to fund MS-13 operations in El Salvador, including sponsoring terrorist activities meant to influence the government of El Salvador.

COUNT ONE<br>(Racketeering Conspiracy)

       59.    The allegations contained in paragraphs 1 through 58 are realleged and incorporated as if fully set forth in this paragraph.

60.    In or about and between 2002 and the date of this Indictment, both dates

being approximate and inclusive, within the Eastern District of New York, El Salvador, Mexico,

and elsewhere, the defendants VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as

"Vampiro de Monserrat Criminales," JOSE WILFREDO AYALA-ALCANTARA, also known

as "Indio de Hollywood," EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as

"Renuente de Abriles Dangers," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger

de Peatonales," WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park

View" and "Bastard de Park View," JUAN ANTONIO MARTINEZ-ABREGO, also known as

"Mary Jane de Hollywood," MARLON ANTONIO MENJIVAR-PORTILLO, also known as

"Rojo de Park View," CARLOS TIBERIO RAMIREZ-VALLADARES, also known as

"Snayder de Pasadena," DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas,"

FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," DANY

BALMORE ROMERO-GARCIA, also known as  "Big Boy de Normandies," "Dig Boy de

Normandies," and "D Boy de Normandies," RUBEN ANTONIO ROSA-LOVO, also known as

"Chivo de Centrales," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de

Park View," together with others, being persons employed by and associated with the Enterprise,

which was engaged in, and the activities of which affected, interstate and foreign commerce, did

knowingly and intentionally conspire to violate 18 U.S.C. § 1962(c), that is, to conduct and

participate, directly and indirectly, in the conduct of the affairs of that Enterprise through a

pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and

1961(5).

61.    The pattern of racketeering activity through which the defendants

VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as "Vampiro de Monserrat

Criminales," JOSE WILFREDO AYALA-ALCANTARA, also known as "Indio de Hollywood,"

EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as "Renuente de Abriles Dangers," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park View" and "Bastard de Park View," JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood," MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View," CARLOS TIBERIO RAMIREZ-VALLADARES, also known as "Snayder de Pasadena," DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas," FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D Boy de Normandies," RUBEN ANTONIO ROSA-LOVO, also known as "Chivo de Centrales," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View," together with others, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Enterprise consisted of:

(a)     multiple offenses involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, in violation of Title 21, United States Code, Sections 841, 846, and 959(a);

(b)     multiple acts indictable under:

(i)     Title 8, United States Code, Section 1324 (relating to bringing in or harboring aliens for financial gain);

(ii)    Title 18, United States Code, Section 956(a)(1) (relating to conspiracy to kill or maim persons outside the United States);

(iii)   Title 18, United States Code, Section 1512 (relating to tampering with a witness, victim, or an informant);

33

(iv)     Title 18, United States Code, Section 1513 (relating to

retaliating against a witness, victim, or an informant);

(v)     Title 18, United States Code, Section 1956 (relating to the

laundering of monetary instruments).

(vi)     Title 18, United States Code, Section 2332b (relating to

conspiracy to commit acts of terrorism transcending national boundaries);

(vii)     Title 18, United States Code, Section 2339A (relating to

conspiracy to provide material support to terrorists); and

(viii)   Title 21, United States Code, Section 960a(a) (relating to

narco-terrorism conspiracy).

It was part of the conspiracy that each defendant agreed that a conspirator would

commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

(Title 18, United States Code, Sections 1962(d), 1963, and 3551 et seq.)

COUNT TWO
(Conspiracy to Provide and Conceal Material Support and Resources to Terrorists)

62.     The allegations contained in paragraphs 1 through 58 are realleged and

incorporated as if fully set forth in this paragraph.

63.     In or about and between 2002 and the date of this Indictment, both dates

being approximate and inclusive, within the Eastern District of New York, El Salvador, and

elsewhere, the defendants VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as

"Vampiro de Monserrat Criminales," JOSE WILFREDO AYALA-ALCANTARA, also known

as "Indio de Hollywood," EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as

Renuente de Abriles Dangers," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger

de Peatonales," WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park

34

View" and "Bastard de Park View," JUAN ANTONIO MARTINEZ-ABREGO, also known as "Mary Jane de Hollywood," MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View," CARLOS TIBERIO RAMIREZ-VALLADARES, also known as "Snayder de Pasadena," DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas," FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," DANY BALMORE ROMERO-GARCIA, also known as "Big Boy de Normandies," "Dig Boy de Normandies," and "D Boy de Normandies," RUBEN ANTONIO ROSA-LOVO, also known as "Chivo de Centrales," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View," together with others, did knowingly and intentionally combine, conspire, confederate, and agree with each other, and others known and unknown to the Grand Jury, to provide material support and resources, and to conceal and disguise the nature, location, source, and ownership of material support and resources, including, but not limited to, personnel, including themselves, currency and monetary instruments, training, weapons, explosives, transportation, and services, knowing and intending that they were to be used in preparation for, and in carrying out, violations of Title 18, United States Code, Section 956(a)(1) (conspiracy to kill or maim persons outside the United States); Title 18, United States Code, Section 2332b (acts of terrorism transcending national boundaries); and Title 21, United States Code, Section 960a (narco-terrorism), and the death of one or more persons resulted.

(Title 18, United States Code, Sections 2339A(a) and 3551 et seq.)

COUNT THREE
(Narco-Terrorism Conspiracy)

64.    The allegations contained in paragraphs 1 through 58 are realleged and incorporated as if fully set forth in this paragraph.



65.     In or about and between 2002 and the date of this Indictment, both dates

being approximate and inclusive, within the Eastern District of New York, El Salvador, and

elsewhere, the defendants VLADIMIR ANTONIO AREVALO-CHAVEZ, also known as

"Vampiro de Monserrat Criminales," JOSE WILFREDO AYALA-ALCANTARA, also known

as "Indio de Hollywood," EDWIN ERNESTO CEDILLOS-RODRIGUEZ, also known as

"Renuente de Abriles Dangers," JORGE ALEXANDER DE LA CRUZ, also known as "Cruger

de Peatonales," WALTER YOVANI HERNANDEZ-RIVERA, also known as "Baxter de Park

View" and "Bastard de Park View," JUAN ANTONIO MARTINEZ-ABREGO, also known as

"Mary Jane de Hollywood," MARLON ANTONIO MENJIVAR-PORTILLO, also known as

"Rojo de Park View," CARLOS TIBERIO RAMIREZ-VALLADARES, also known as

"Snayder de Pasadena," DANY FREDY RAMOS-MEJIA, also known as "Cisco de Teclas,"

FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," DANY

BALMORE ROMERO-GARCIA, also known as  "Big Boy de Normandies," "Dig Boy de

Normandies," and "D Boy de Normandies," RUBEN ANTONIO ROSA-LOVO, also known as

"Chivo de Centrales," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de

Park View," together with others, did knowingly and intentionally combine, conspire,

confederate, and agree with each other, and others known and unknown to the Grand Jury, to

engage in conduct that would be punishable under Title 21, United States Code, Section 841(a),

if committed within the jurisdiction of the United States, that is to knowingly and intentionally

distribute and possess with intent to distribute marijuana, cocaine, heroin, methamphetamine,

and other controlled substances, knowing and intending to provide, directly and indirectly,

anything of pecuniary value to any person and organization, to wit: MS-13, that has engaged and

engages in terrorist activity, as defined in Title 8, United States Code, Section 1182(a)(3)(B), and terrorism, as defined in Title 22, United States Code, Section 2656f(d)(2).

(Title 21, United States Code, Section 960a(a); Title 18, United States Code, Sections 3551 et seq.)

## COUNT FOUR
### (Alien Smuggling Conspiracy)

66.     The allegations contained in paragraphs 1 through 58 are realleged and incorporated as if fully set forth in this paragraph.

67.     On or about and between January 1, 2015 and the date of this Indictment, both dates being approximate and inclusive, within the Eastern District of New York, El Salvador, Mexico, and elsewhere, the defendants JORGE ALEXANDER DE LA CRUZ, also known as "Cruger de Peatonales," MARLON ANTONIO MENJIVAR-PORTILLO, also known as "Rojo de Park View," FRANCISCO JAVIER ROMAN-BARDALES, also known as "Veterano de Tribus," and MIGUEL ANGEL SERRANO-MEDINA, also known as "Cabro de Park View," together with others, knowing that one or more persons were aliens, did knowingly and intentionally conspire to bring such aliens into the United States, at a place other than a designated port of entry or a place designated by the Commissioner of Immigration and Nationality, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(i), did cause serious bodily injury, and did place in jeopardy the life of any person, and the death of one or more persons resulted.

(Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), 1324(a)(1)(B)(i), 1324(a)(1)(B)(iii) and 1324(a)(1)(B)(iv); Title 18, United States Code, Sections 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNT ONE

68.     The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count One, the government will seek forfeiture in accordance with Title 18, United States Code, Section 1963(a), which requires any person convicted of such offense to forfeit: (a) any interest the person acquired or maintained in violation of Title 18, United States Code, Section 1962; (b) any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over any enterprise which the person has established, operated, controlled, conducted or participated in the conduct of, in violation of Title 18, United States Code, Section 1962; and (c) any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity or unlawful debt collection in violation of Title 18, United States Code, Section 1962.

69.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described in this forfeiture allegation.

(Title 18, United States Code, Sections 1963(a) and 1963(m))

CRIMINAL FORFEITURE ALLEGATION
AS TO COUNT TWO

70.    The United States hereby gives notice to the defendants that, upon their conviction of the offense charged in Count Two, the government will seek forfeiture in accordance with Title 18, United States Code, Sections 981(a)(1)(C) and 981(a)(1)(G) and Title 28, United States Code, Section 2461(c), which require the forfeiture of: (a) any property, real or personal, constituting or derived from proceeds traceable to said offense; and (b) all assets, foreign or domestic: (i) of any individual, entity or organization engaged in planning or perpetrating any Federal crime of terrorism against the United States, citizens or residents of the United States, or their property, and all assets, foreign or domestic, affording any person a source of influence over any such entity or organization; (ii) acquired or maintained by any person with the intent and for the purpose of supporting, planning, conducting or concealing any Federal crime of terrorism against the United States, citizens or residents of the United States, or their property; (iii) derived from, involved in, or used or intended to be used to commit any Federal crime of terrorism against the United States, citizens or residents of the United States, or their property; or (iv) of any individual, entity or organization engaged in planning or perpetrating any act of international terrorism against any international organization or against any foreign Government.

39

71.     If any of the above-described forfeitable property, as a result of any act or

omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

        (Title 18, United States Code, Sections 981(a)(l)(C) and 981(a)(1)(G); Title 21,

United States Code, Section 853(p); Title 28, United States Code, Section 246l(c))

### CRIMINAL FORFEITURE ALLEGATION
### AS TO COUNT THREE

72.     The United States hereby gives notice to the defendants charged in Count

Three that, upon their conviction of such offense, the government will seek forfeiture in

accordance with Title 21, United States Code, Sections 853(a) and 970, which require any person

convicted of such offense to forfeit: (a) any property constituting, or derived from, any proceeds

obtained directly or indirectly as the result of such offense; and (b) any property used, or

intended to be used, in any manner or part, to commit, or to facilitate the commission of, such

offense.

73.     If any of the above described forfeitable property, as a result of any act or

omission of the defendants:

        (a)     cannot be located upon the exercise of due diligence;

        (b)     has been transferred or sold to, or deposited with, a third party;

        (c)     has been placed beyond the jurisdiction of the court;

        (d)     has been substantially diminished in value; or

        (e)     has been commingled with other property which cannot be divided

without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to

seek forfeiture of any other property of the defendants up to the value of the forfeitable property

described in this forfeiture allegation.

        (Title 21, United States Code, Sections 853(a), 853(p) and 970)

A TRUE BILL

FOREPERSON

BRÉON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

41

F.#: 2020R00632
FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

CRIMINAL DIVISION

THE UNITED STATES OF AMERICA

*vs.*

VLADIMIR ANTONIO AREVALO-CHAVEZ, ET AL.,

Defendants.

# INDICTMENT

(T. 8, U.S.C., §§ 1324(a)(1)(A)(v)(I),1324(a)(1)(B)(i), 1324(a)(1)(B)(iii), and1324(a)(1)(B)(iv); T. 18, U.S.C.,§§ 981(a)(1)(C), 981(a)(1)(G), 1962(d),1963, 1963(a), 1963(m), 2339A(a), and 3551et seq.; T. 21, U.S.C., §§ 853(a), 853(p),960a(a), and 970; T. 28, U.S.C., § 2461(c))

*A true bill.*

_____
                                                                    *Foreperson*

*Filed in open court this* _____ *day,*

*of* _____     *A D. 20* ___

- - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                                              *Clerk*

*Bail, $* _____
        - - - - - - - - - - - - - - - - - - - - - - - - -

***John J. Durham, Assistant U.S. Attorney (631) 715-7851***